Soler Aquino, Juez Ponente
*717 TEXTO COMPLETO DE LA RESOLUCIÓN
La recurrente solicita revisión de una resolución dictada por el Departamento de Salud el 2 de marzo de 2007, archivada el 6 de marzo de 2007, mediante la que autorizó un certificado de necesidad y conveniencia (CNC) para la compra, instalación y operación de un equipo PET/CT.
Alega que dicho foro erró al otorgar el CNC, ya que la solicitud no cumplió con los criterios generales ni específicos para el PET y CT establecidos en el Reglamento Número 112 .del 9 de marzo de 2004 y bajo los cuales se evaluó el caso.
La recurrida, Bioimágenes Médicas CSP, presentó una solicitud de CNC para operar una unidad integrada de tomografía de emisión de positrones y tomografía computarizada, en adelante (PET-CT).
A la vista en su fondo compareció la proponente representada por su abogada y los interventores, Western Pet Scan Institute y Mayagüez Nuclear Mad, también representados por sus abogados. Se presentó una extensa prueba documental que se detalla en el informe de la Oficial Examinadora. El Departamento de Salud acogió dicho informe y basado en el mismo, dictó la resolución recurrida autorizando el CNC.
A base de la prueba desfilada en dicho informe, el foro administrativo determinó como hechos probados que la proponente recurrida brinda servicios de radiología digital, mamografía, ultrasonido, densitomografía computarizada, resonancia magnética y ultrasonidometría ósea, tomografía computarizada y resonancia magnética, en la Avenida Hostos de Mayagüez. Las facilidades físicas de la oficina serían compartidas con el nuevo servicio de PET/CT. El lugar cuenta con estacionamiento libre de costos para los pacientes, facilidades para impedidos, estacionamientos y facilidades para pacientes en camilla. La presidenta es doctora en medicina con especialidad en radiología diagnóstica y..un ‘fellowship” en tomografía computarizada, resonancia magnética y ultrasonido. Además, cuenta con créditos en educación médica continuada, que incluyen avances en neuroradiología, radiología cardiovascular y PET/CT. Otro de los médicos que prestan servicios en las facilidades tiene una especialidad en radiología y durante su internado estuvo expuesto a la técnica de PET. Además, contarían con los servicios especializados de un médico con experiencia en este equipo y personal especializado dedicado exclusivamente a la propuesta de PET/CT, como un teenólogo radiológico en PET a tiempo completo, un administrador, un oficial de facturación a tiempo parcial y otros.
Surge de la resolución recurrida, que a través del PET, se puede evaluar cualquier cambio bioquímico anormal del cuerpo y es la forma más efectiva de diagnosticar la recurrencia de cáncer. Ofrece múltiples *718 ventajas sobre otras técnicas de imágenes como el CT o el MRI. El estudio de PET permite detectar los cambios patológicos, antes de que se produzcan cambios anatómicos del tamaño, de forma más adecuada de la que podría detectarse por las modalidades de CT y MRI. Se pueden evaluar pacientes de cáncer para detectar temprano la enfermedad. El equipo también ha sido exitoso en problemas neuropsiquiátricos, neurológicos y cardiovasculares. Las imágenes del equipo PET son funcionales y miden cambios en metabolismo, a diferencia del CT o MRI que evalúan la estructura. La técnica del PET es superior a otras modalidades. Sin embargo, en muchos casos, particularmente en los de evaluación de cáncer, se sugiere comparar el resultado de los tres estudios para tener una visión multidimensional de los órganos afectados y la localización específica del cáncer. Los estudios publicados en la literatura médica establecen que la técnica más avanzada combina los servicios del PET y CT Sean, comparado a un estudio de PET o CT SCAN por separado.
La unidad básica de población o de servicios correspondientes a la Región Oeste, comprende el área de Mayagüez compuesta por los municipios de Añasco, Cabo Rojo, Hormigueros, Las Marías, Maiicao, Mayagüez y Rincón; el área de Aguadilla compuesta por Aguada, Aguadilla, Isabela, Moca y San Sebastián, y el área de San Germán compuesta por Lajas, Sabana Grande y San Germán. La prueba desfilada demostró que la población de la región oeste exhibió una tasa de crecimiento poblacional mayor a la de todo Puerto Rico. Este patrón se observa desde 2001 hasta el 2010, lo que pudiera implicar que la demanda por servicios de salud, en general, en el área también crecerá a una tasa mayor que la demanda en todo Puerto Rico. Los datos de población por grupos de edad presentados en el Estudio de Viabilidad Pericial, revelan que el mayor crecimiento para la década del 1990-2000, ocurrió consistentemente en los grupos de edad de 50 a 59 años y el grupo de personas mayores de 60 años. Este resultado es relevante para el análisis de necesidad, ya que las personas de edad avanzada son las más propensas a contraer enfermedades de naturaleza oncológica y cardiovascular que la población que más se beneficia de los servicios propuesto.
La prueba presentada en el foro administrativo demostró que en la región oeste no hay ningún equipo de PET ni de PET/CT operando, aun cuando se autorizaron CNC para operar y adquirir equipo de PET a Western Pet Scan y a Mayagüez Nuclear Med y por vía de exención a Aguadilla X Ray. Además hay otra solicitud pendiente de Diagnostic Nuclear Med de Aguadilla. Sin embargo, el PET aprobado a Western es exclusivamente para delinear el tratamiento a ofrecerse a pacientes de radioterapia y no para fines diagnósticos. El aprobado a Mayagüez no compara con el equipo de alta tecnología propuesto por Bioimágenes que integra imágenes de PET y CT. El aprobado a Aguadilla vía exención, aún no está operando y sería instalado a mucho mayor distancia de los hospitales. Los servicios propuestos beneficiarían a los pacientes de Mayagüez, donde operan cinco hospitales. Además podrían beneficiarse los pacientes de otros cinco hospitales ubicados en otros municipios de la región.
A base de los hechos probados, el foro administrativo aplicó a la solicitud del recurrente para la operación de un PET/CT, los criterios establecidos en la Ley Número 2 del 7 de noviembre de 1975, 24 L.P.R.A. see. 334 (b), y el Reglamento Número 112 del Departamento de Salud. No obstante, hizo énfasis en que dicho reglamento no contiene criterios particulares aplicables a las facilidades y/o servicios PET/CT. Este equipo se considera como nuevo e innovador, con un carácter distinto de los equipos de PET y CT separados, por lo que no es mandatorio aplicar a todo caso de PET/CT los criterios específicos que para PET y CT que separadamente establece el Reglamento Número 112.
El Departamento de Salud aplicó los criterios establecidos en dicho reglamento de la siguiente manera:

“1. Se establece una norma de un PET por cada 400.000 habitantes hasta un máximo de dos PET por región.

En este caso, la evidencia desfilada demostró que la Región Oeste exhibió una tasa de crecimiento poblacional mayor a la de todo Puerto Rico. Este patrón se observa desde el 2002 hasta 2010, lo que pudiera 
*719
implicar que la demanda por servicios de salud, en general, en el área también crecerá a una tasa mayor que la demanda para todo el país. Las estadísticas presentadas por una perito economista demostraron la existencia de un aumento significativo en la población mayor a los 60 años en la Región Oeste. Para el 2000, la proporción de la población de envejecientes en la Región Oeste en comparación con la de todo Puerto Rico, aumentó al 15.63% comparado al 14.76% en el 1990. Además, la población de municipios aledaños, que aunque pertenecen a otras áreas' se encuentran más cerca de Mayagüez, debido a su proximidad y a los excelentes accesos viales, puede considerarse como población flotante relevante al área de servicios. Para el 2006, la población a ser servida por el PET/CT propuesto, tomando en consideración el 60% de la población flotante, estaríá compuesta de al menos 658.196 habitantes.

2. El profesional a cargo de la interpretación de estos estudios deberá tener evidencia de haber recibido adiestramiento en las modalidades de PET durante su residencia en radiología diagnóstica o, en su defecto, haber recibido un. número de horas de educación médica continua en esta modalidad en instituciones acreditadas.

La evidencia desfilada demostró que los profesionales a cargo de la interpretación de los estudios de PET/ CT cuentan con el entrenamiento requerido y poseen los conocimientos necesarios para ello.

3. La facilidad autorizada deberá rendir informes periódicos al Secretario de Salud sobre la utilización, costo por servicio, costos de operación y costos de mantenimiento.

La proponente ha cumplido a cabalidad con este requisito en sus otras facilidades y ha expresado su compromiso para hacerlo si se aprueba el CNC.

4. El proponente deberá obligarse, a que de ser autorizado, prestará servicios a pacientes recipientes de la Reforma de Salud.

La proponente cumple con este requisito, ya que acreditó que aceptará la Reforma de Salud.

5. El Secretario de Salud podrá considerar favorablemente una solicitud que proponga compartir el equipo de PET con una facilidad de radioterapia o de medicina nuclear CT.

El Departamento de Salud reconoce que ha concedido CNC a otras facilidades en casos en que este criterio no ha sido cumplido. La promovente en este caso no propone realizar diagnósticos de CT con el equipo PET/CT. Sin embargo, el foro administrativo aplicó los criterios establecidos para CT, con el propósito de determinar si el componente de CT propuesto en la solicitud de PET/CT constituye un nuevo servicio de salud. Analizada la totalidad de la prueba en el récord y a la luz de las normas citadas, dicho foro concluyó que el componente de CT del equipo propuesto, no'constituye un nuevo servicio de salud. Toda vez que la proponente ya cuenta con un CNC para operar una facilidad de CT, el equipo de PET/CT, para el cual se solicita el CNC, no fue considerado como una facilidad adicional de CT. ”

Del análisis de evidencia en el récord administrativo y a la luz de los criterios generales y específicos aplicables, el foro administrativo concluyó que la facilidad propuesta proveerá un servicio que cubrirá una necesidad de salud y una demanda insatisfecha de la población de la Región Oeste. La prueba demostró que será necesario y conveniente para los pacientes que reciben servicios en la facilidad radiológica de Biomágenes y para los pacientes del área de servicio, ya que en esta región no existe ninguna facilidad que opere equipo de esa naturaleza. En la actualidad, los pacientes tienen que trasladarse a otras áreas, particularmente al área metropolitana.
Amparado en los fundamentos antes expuestos, concedió a la proponente recurrida el Certificado de
*720 Necesidad y Conveniencia, para operar un equipo PET/CT.
La controversia planteada se reduce a determinar si el foro administrativo erró al otorgar el CNC.
La revisión judicial de decisiones administrativas tiene como fin primordial delimitar la discreción de los organismos administrativos, para asegurar que éstos ejerzan sus funciones conforme la ley y de forma razonable. Por lo general, éstos gozan de gran deferencia y respeto de parte de los tribunales. Esto se fundamenta en la vasta experiencia y el conocimiento especializado que poseen los organismos administrativos sobre los asuntos que estatutariamente les han sido encomendados por el legislador. Empresas Ferrer Inc. v. Administración de Reglamentos y Permisos, 2007 J.T.S. 181.
La sección 4.5 de la Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A. see. 2175, estipula que las determinaciones de hechos de las agencias administrativas serán sostenidas, si están fundamentadas por evidencia sustancial que obre en el expediente administrativo considerado en su totalidad. La evidencia sustancial se define como aquélla que es relevante y que una mente razonable podría aceptar como adecuada para sostener una conclusión. La aplicación de este principio evita que se sustituya el criterio del organismo administrativo en materia especializada por aquél del tribual revisor. Empresas Ferrer v. Administración de Reglamentos y Permisos, supra.
En cuanto a las conclusiones de derecho, la Ley de Procedimiento Administrativo Uniforme dispone que éstas pueden ser revisadas en todos sus aspectos por el tribunal. No obstante, los tribunales deben concederle gran peso y deferencia a las interpretaciones que los organismos administrativos realizan de las leyes y reglamentos que administran, por lo que no pueden descartar libremente las conclusiones e interpretaciones de la agencia, sustituyendo el criterio de éstas por el propio. Si la interpretación de la ley o reglamento que la agencia realiza es razonable, aunque no sea la única razonable, los tribunales deben concederle deferencia. Más aún, los tribunales sólo podrán sustituir el criterio de la agencia por el suyo, únicamente cuando no encuentren una base racional para explicar la determinación administrativa. Empresas Ferrer v. Administración de Reglamentos y Permisos, supra.
No obstante, la deferencia judicial cede en circunstancias meritorias y apropiadas como cuando: 1) la determinación administrativa no está basada en evidencia sustancial, 2) el organismo administrativo ha errado en la aplicación o interpretación de las leyes o reglamentos que se le han encomendado administrar, 3) cuando actúa arbitraria, irrazonable o ilegalmente realizando determinaciones carentes de una base racional, 4) si la actuación administrativa lesiona derechos constitucionales fundamentales. Empresas Ferrer v. Administración de Reglamentos y Permisos, supra.
El Certificado de Necesidad y Conveniencia (CNC) es el documento emitido por el Departamento de Salud autorizando a una persona a llevar a cabo cualquiera de las actividades cubiertas por ley, donde se certifica que la misma es necesaria para la población que va a servir y que no afectará los servicios existentes, de modo que contribuya al desarrollo ordenado y adecuado de los servicios de salud en Puerto Rico. 24 L.P.R.A. see. 334 (e).
Ninguna persona podrá adquirir o construir una facilidad de salud u ofrecer o desarrollar un nuevo servicio de salud, hacer inversiones de capital por o a favor de una facilidad de salud, o adquirir equipo médico altamente especializado, sin antes haber obtenido un CNC. 24 L.P.R.A. sec 334(a).
El Secretario de Salud establecerá, mediante reglamento, los criterios para expedir o denegar el certificado de necesidad y conveniencia. Al establecer dichos criterios, tomará en consideración las guías generales establecidas en la ley federal, la ley local y la política pública adoptada por la Junta de Planificación. Entre dichos criterios se considerarán los siguientes:
*721 “1. La relación entre la transacción para la cual se solicita el certificado y plan de desarrollo de servicios a largo plazo, si alguno del solicitante.

2. La necesidad actual y proyectada que tiene la población a ser afectada por la transacción contemplada de los servicios que se proveerán mediante la misma.

3. La existencia de alternativas a la transacción para la cual se solicita el certificado. La posibilidad de proveer los servicios contemplados de manera más eficiente ó menos costosa que lá propuesta por el solicitante.

4. La relación entre el sistema de salud operante y la transacción en el área propuesta.

5. En el caso específico de solicitantes de CNC para el ofrecimiento de servicios de salud, el Secretario deberá considerar también los siguientes factores:

a. La disponibilidad de Recursos Humanos y económicos para el rendimiento eficiente de esos servicios.

b. El impacto que la forma de proveer los servicios tendrá sobre las necesidades de entrenamiento clínico que puedan tener los profesionales de la salud del área donde los servicios habrán de prestarse.

c. El por ciento de la población del área a ser servida que tendrá acceso a los servicios propuestos. El Secretario deberá exigir que la solicitud indique el tiempo que el solicitante necesitará para hacer disponible el servicio o equipo objeto de la petición o realizare gasto objeto de la transacción. 24 L.P.R.A. sec. 334(b). ”

Cónsono con las facultades conferidas por ley, el Departamento de Salud creó el Reglamento Número 112 del 9 de marzo de 2004, para regir el proceso de evaluación de solicitudes para el otorgamiento de CNC. El Artículo VI establece unas guías generales sobre la evaluación de solicitudes. El Secretario de Salud tomará en cuenta en la medida que sean de aplicabilidad al caso, los factores o criterios evaluativos generales. En el referido proceso evaluador, el Secretario mantendrá la discreción necesaria para sopesar y examinar dichos criterios de la forma y manera que facilite el poner en vigor las disposiciones de la citada Ley Núm. 2 y la política pública del Departamento de Salud. Estos criterios generales son los mismos establecidos en la Ley Número 2. A saber:

“1. La relación entre la transacción para la cual se solicita el certificado y el plan de desarrollo de servicios a largo plazo, si alguno del solicitante.

2. La necesidad actual y proyectada que tiene la población a ser afectada por la transacción contemplada de los servicios que se proveerán mediante la misma.

3. La existencia de alternativas a la transacción para la cual se solicita el certificado o la posibilidad de proveer los servicios contemplados de manera más eficiente o menos costosa que la propuesta por el solicitante.

4. La relación entre el sistema de salud operante en el área y la transacción propuesta. ”

En el caso específico del CNC para el otorgamiento de servicios de salud, el Secretario de Salud deberá considerar los siguientes factores:

“a. La disponibilidad de recursos humanos y económicos para el rendimiento eficiente de esos servicios.

*722
b.El impacto que la forma de proveer los servicios tendrá sobre las necesidades de entrenamiento clínico que puedan tener los profesionales de salud del área en donde los servicios habrá de prestarse

c. El por ciento de la población del área a ser servida que tendrá acceso a los servicios propuestos.

d. El Secretario deberá exigir que la solicitud indique el tiempo que el solicitante necesitará para hacer disponible el servicio o equipo objeto de la petición o realizar el gasto objeto de la transacción. ”

Por su parte, el Artículo VIII (L) del Reglamento establece los criterios particulares a considerar en el caso de las facilidades radiológicas.
En el caso de los servicios de tomografía computadorizada se establece una norma de una facilidad por cada 25,000 habitantes para la sub-región de salud.
1. No se autorizará equipo adicional de este tipo hasta tanto las facilidades existentes en el área de servicio hayan sobrepasado mil procedimientos en un año.
2. Se tomará como un factor a considerar favorablemente que el equipo se vaya a instalar en un hospital.
3. El proponente deberá demostrar a satisfacción del secretario que podrá contratar el personal técnico necesario para ofrecer el servicio propuesto. Todo profesional a cargo de la interpretación de estos estudios deberá tener un entrenamiento mínimo en esta modalidad provisto por instituciones debidamente acreditadas por el Accreditation Council for Graduate Medical Education y certificado por la American Board of Radiology.
4. No se podrá autorizar el establecimiento de facilidades de tomografía computarizada adicionales en el área de servicio, sobrepasa la oferta en aquella cantidad que sea suficiente para permitir la viabilidad de una nueva facilidad.
5. El Secretario de Salud podrá considerar favorablemente una solicitud que proponga compartir el equipo de tomografía computarizada, con una facilidad de radioterapia o de PET.
En lo que respecta a la tomografía de emisión de positrones (PET), definida como el método que produce imágenes tridimensionales de alta intensidad reconstruidas por computadora que miden y determinan la función o fisiología de.un órgano en particular, un tumor o cualquier otra actividad metabólica.
Se establece la región como el área de servicio básica para este tipo de facilidad. Se podrá tomar en consideración la población flotante en la estimación de la población a ser servida.
1. Se establece una norma de un (1) PET por cada 400,000 habitantes, hasta un máximo de dos (2) PET por Región.
2. El profesional a cargo de la interpretación de estos estudios deberá tener evidencia de haber recibido adiestramiento en la modalidad de PET durante su residencia en radiología diagnóstica o, en su defecto, haber recibido un número de horas de educación médica continua en esta modalidad en instituciones acreditadas.
3. La facilidad autorizada deberá rendir informes periódicos al Secretario de Salud sobre la utilización, costo por servicio, costos de operación y costos de mantenimiento.
4. El proponente deberá obligarse a que de ser autorizado, prestará servicios a pacientes recipientes de la Reforma de Salud.
*723 5. El Secretario de Salud podrá considerar favorablemente una solicitud que proponga compartir el equipo de PET con una facilidad de radioterapia o de medicina nuclear.
La decisión de otorgar o denegar un CNC surge de un proceso evaluativo institucional que culmina con la decisión personal del Secretario de Salud. Éste tiene discreción para denegar el certificado o para concederlo, si es necesario y conveniente y asimismo tiene discreción para obviar- un criterio reglamentario cuando sea procedente. Las disposiciones de las sees. 334 et. seq. de este título que el Secretario de Salud debe observar durante las etapas del proceso de conceder o denegar los CNC requeridos, sólo significan que su discreción está debidamente limitada y no pretende.ser una camisa de fuerza para restringir innecesariamente la propia facultad que le delegan para expedir o denegar los certificados referidos. Lab. Inst. Med Ava. v. Lab. C. Borinquen, 149 D.P.R. 121 (1999)
El recurrente no ha derrotado la deferencia que merece la decisión emitida por el foro administrativo. La resolución recurrida está basada y fundamentada en evidencia sustancial que surge del récord de la agencia. Dicha paite tampoco ha demostrado que exista alguna otra evidencia sustancial, que derrote el valor y credibilidad de la evidencia en que se sostiene la resolución administrativa. En cuanto a las conclusiones de derecho, la recurrente no ha demostrado que las mismas sean irrazonables. Distinto a lo alegado en este recurso, hemos encontrado que el Secretario de Salud aplicó los criterios generales establecidos en la citada Ley Núm. 2 y el Reglamento Número 112 para la aprobación del CNC, solicitado de acuerdo con la discreción conferida en ley y basado en los beneficios que representa para los pacientes del área el satisfacer una necesidad de salud que no había sido cubierta.
Por todas las razones antes expuestas recurrida. y de conformidad al derecho citado, se confirma la resolución
Así lo pronunció el Tribunal y lo certifica la Secretaria.
María E. Pérez Ortiz
Secretaria del Tribunal de Apelaciones